UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

YELANIS BROOK,

    Plaintiff,

v.                                         Case No: 8:17-cv-171-T-30AAS

SISTEMA UNIVERSITARIO ANA G.
MENDEZ, INC.,

    Defendant.

## ORDER

THIS CAUSE comes before the Court upon Defendant's Motion to Dismiss (Doc. 15), Plaintiff's Response in Opposition (Doc. 17), and Defendant's Reply (Doc. 27). Upon review, the Court partially grants Defendant's motion. As discussed herein, the Court will dismiss Count I without prejudice.

### BACKGROUND

Sistema Universitario Ana G. Mendez, Inc. ("SUAGM") is a non-profit that operates three universities in Puerto Rico. It has expanded to include several campuses in the U.S., including one in Tampa.

Plaintiff Yelanis Brook completed a Master's degree in Education (i.e., Guidance and Counseling) at SUAGM's Tampa campus. Subsequently, she filed this action. She alleges that SUAGM intentionally discriminates against Latinos like herself by targeting them for a fraudulent educational program.

Plaintiff's fifty-three page Complaint (Doc. 1) details a number of fraudulent practices allegedly committed by SUAGM.[1] For example, SUAGM's Tampa campus represents to students that they will be attending a SUAGM institution when in fact SUAGM has outsourced the operation of its U.S. educational programs to Agmus Ventures, Inc., an unlicensed, unaccredited, for-profit entity. The U.S. campuses benefit from SUAGM's name recognition in the Latino community but are vastly inferior to the Puerto Rico universities in fourteen areas: management, faculty, course materials, preparation of academic content, delivery of academic programs, CACREP accreditation, internships, entry/exit requirements, facilities, libraries, technology, mission, history, and intellectual development. The Complaint also describes other fraudulent practices, including that SUAGM's Tampa campus knowingly misrepresents that its Master's program is a State-Approved Educator Preparation Program, that it is capable of providing valid internships required to work in public schools in Florida, and that it validates college credits and degrees from foreign colleges. These misrepresentations induced Plaintiff to enroll in SUAGM's program and take out significant debt to pay SUAGM's tuition, which she would not have done had she known she would receive a worthless degree.

This action bears similarities to cases filed against for-profit schools but is somewhat unique in that Plaintiff alleges that SUAGM specifically targets low-income Latinos, many of whom are recent immigrants to the U.S., for its "sham" program. It both

---

[1] For purposes of evaluating Defendant's Motion to Dismiss, the Court must assume all of these factual allegations are true.

targets its marketing to the Latino population and enrolls Latino students in numbers highly disproportionate to their rate in the population. She alleges that "nearly all" of SUAGM's "victims" are Latino and the "majority" are immigrants. She believes SUAGM targets this population because it believes they are unsophisticated, do not understand English, and do not understand how the educational and legal systems work in the U.S.

Plaintiff's Complaint asserts five claims. Plaintiff contends that SUAGM violated the Equal Credit Opportunity Act (Count I), Title VI of the Civil Rights Act of 1964 (Count II), and Florida's Deceptive and Unfair Trade Practices Act (Count III), that it breached an implied-in-fact contract (Count IV), and that it fraudulently induced her to contract (Count V). SUAGM argues that Plaintiff has failed to state a claim under the Equal Credit Opportunity Act or Title VI of the Civil Rights Act of 1964, and therefore the Court lacks subject matter jurisdiction to hear Plaintiff's state law claims.

## LEGAL STANDARD

In reviewing a pro se complaint, the court must hold the pro se pleading to a less stringent standard and must construe the complaint liberally. *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998) (per curiam) (citation omitted). Although courts afford liberal construction to pro se litigants' pleadings, litigants appearing pro se must still meet minimal pleading standards. *Olsen v. Lane*, 832 F. Supp. 1525, 1527 (M.D. Fla. 1993).

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss a complaint when it fails to state a claim upon which relief can be granted. When reviewing a motion to dismiss, a court must accept all factual allegations contained in the complaint as true.

*Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal citation omitted). It must also construe those factual allegations in the light most favorable to the plaintiff. *Hunt v. Aimco Properties, L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016) (internal citation omitted).

To withstand a motion to dismiss, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Pleadings that offer only "labels and conclusions," or a "formulaic recitation of the elements of a cause of action," will not do. *Twombly,* 550 U.S. at 555.

## DISCUSSION

### I.   Equal Credit Opportunity Act

The Equal Credit Opportunity Act ("ECOA") makes it unlawful "for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691(a)(1). ECOA and its regulations define a "creditor" as anyone who extends credit, regularly arranges for the extension of credit, or refers prospective applicants to creditors in the course of his or her business. 15 U.S.C. § 1691a(e); 12 C.F.R. § 202.2(l). A credit transaction is defined as "every aspect of an applicant's dealings with a creditor regarding an application for credit or an existing extension of credit (including, but not limited to, information requirements; investigation procedures; standards of credit worthiness; terms of credit; furnishing of credit information; revocation, alteration, or termination of credit;

and collection procedures)." 12 C.F.R. § 202.2(m). Due to ECOA's expansive language, courts have held that creditors can be held liable not only for denying credit to members of a protected class (i.e., redlining) but also for offering them credit on terms that are predatory or unfair (i.e., reverse redlining). *E.g., U.S. ex rel. Cooper v. Auto Fare, Inc.*, No. 3:14-CV-0008-RJC, 2014 WL 2889993, at *1-3 (W.D.N.C. June 25, 2014); *M & T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 574-76 (E.D.N.Y. 2010); *Hargraves v. Capital City Mortg. Corp.*, 140 F. Supp. 2d 7, 20-23 (D.D.C. 2000). For example, in one case, a court held that a plaintiff stated an ECOA claim by alleging that a chain of car dealerships located in African-American neighborhoods offered installment sales contracts with disproportionately high sales prices, large down payments, and high interest rates and repossessed their customers' cars even when they were not in default. *Cooper*, 2014 WL 2889993, at *1, *3.

The Complaint alleges facts sufficient to demonstrate that SUAGM is a "creditor" as defined by ECOA. Although it does not appear that SUGAM itself offered loans, it did refer prospective loan applicants to creditors. For example, Plaintiff alleges that SUAGM provided students with marketing materials to incentivize them to apply for federal student loans and even entered them in a drawing to win a new iPad if they applied for the loans by a certain date. (Doc. 1, ¶ 152.)

Even so, the Complaint does not state a claim under ECOA. Plaintiff does not explicitly describe the credit transaction she believes was unlawful, other than to note that she took out federal student loans in excess of $40,000. (*Id.* at ¶¶ 142, 146, 152, 179). Plaintiff does not describe any aspects of the credit transaction (as opposed to SUAGM's

fraudulent enrollment tactics) that she believes were discriminatory. Although she refers to the loans she took out as "predatory" and "unfair" (*Id*. at ¶¶ 3, 4, 40, 137, 159), she does not describe any specific loan terms that she believes were predatory or unfair.

Given that the federal government determines students' eligibility for its graduate student loans and offers those loans to all eligible students on the same terms, it is unlikely that Plaintiff can allege facts sufficient to demonstrate that her loan terms were unfair. Nonetheless, the Court will allow Plaintiff an opportunity to amend her pleading if she wishes.

## II. Title VI of the Civil Rights Act of 1964

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Title VI itself prohibits only instances of intentional discrimination.[2] *Alexander v. Sandoval*, 532 U.S. 275, 282 (2001) (internal citation omitted).

SUAGM argues that Plaintiff's Title VI claim should be dismissed for two reasons. First, it argues that Plaintiff has not sufficiently alleged that it intentionally discriminated against her because she is Latino, in part because she has not alleged that SUAGM treated

---

[2] The regulations implementing Title VI also prohibit programs from utilizing facially neutral criteria or methods of administration that have a discriminatory effect on members of protected classes (i.e., from engaging in practices that have a disparate impact on those classes). 28 C.F.R. § 42.104(b)(2). However, the Supreme Court has held that litigants do not have a private right of action to enforce the disparate impact regulations and only the Department of Justice can do so. *Alexander*, 532 U.S. at 293.

her differently than a non-Latino student in its educational program. Second, it argues that Plaintiff's Title VI claim is best characterized as a claim that SUAGM engaged in discriminatory advertising, and discriminatory advertising alone cannot violate Title VI. The Court disagrees.

The Complaint alleges that SUAGM intentionally targets Latinos, many of whom are recent immigrants to the U.S, for a "sham" educational program. It does not allege that SUAGM employed facially neutral practices that disparately and negatively impacted Latinos; rather, it alleges that SUAGM deliberately targeted the Latino population for a fraudulent scheme.

The Complaint makes factual allegations from which the Court can reasonably infer intentionality. For example, the Complaint alleges that SUAGM's student population is disproportionately (i.e., "nearly all") Latino. (Doc. 1, ¶¶ 4, 145.) It also alleges facts sufficient to indicate that this disproportionality is due to intentional targeting. The Complaint notes that SUAGM has made statements that "Latinos" are its target market. (*Id*. at ¶ 148.) It strategically placed its U.S. campuses in cities "emerging with Hispanic market[s]." (*Id*. at ¶ 145.) In addition, it intentionally recruits Latinos for its educational programs by focusing its marketing on channels that disproportionately reach a Latino audience (e.g., by advertising on Univision and Telemundo, Spanish-language radio stations, Spanish-language newspapers, Spanish-language websites, and outdoor bus stations), as well as by using social media, telemarketing, and direct mail campaigns to target prospective Latino students. (*Id*. at ¶¶ 5, 139-141, 149-150.)

Plaintiff is not arguing that targeted advertising alone constitutes a violation of Title VI. Rather, she is arguing that targeting her for a fraudulent scheme because of her ethnicity or national origin violates Title VI. It is the combination of the targeted advertising *and* the allegedly "sham" educational program that allows the Court to infer intentional discrimination. The discrimination claim arises from the harmful product being peddled; the targeted advertising simply helps to prove that the discrimination was intentional.[3]

The Court sees no reason why Plaintiff cannot pursue her Title VI claim using a theory akin to reverse redlining. Courts have allowed plaintiffs to advance reverse redlining theories under other civil rights laws, like ECOA, the Fair Housing Act ("FHA"), and sections 1981 and 1982. *See, e.g., Clark v. Universal Builders, Inc.*, 501 F.2d 324, 334 (7th Cir. 1974) (§ 1982); *M & T Mortg. Corp. v. White*, 736 F. Supp. 2d at 574-76 (ECOA and FHA); *Matthews v. New Century Mortg. Corp.*, 185 F. Supp. 2d 874, 885-88 (S.D. Ohio 2002) (ECOA and FHA); *Hargraves*, 140 F. Supp. 2d at 19-20 (FHA, § 1981, § 1982);

---

[3] The Court has not ignored *Brown v. Phillip Morris, Inc.*, which SUAGM cited to argue that this case involves a discriminatory advertising claim that is not actionable. That said, the Court is not bound by that case and does not find it persuasive.

In *Brown*, the African American plaintiffs argued that the defendant tobacco companies violated section 1981 (prohibiting discrimination in making and enforcing contracts) and 1982 (prohibiting discrimination in owning, leasing, and conveying property) by targeting advertising of harmful menthol cigarettes to African Americans. *Brown v. Phillip Morris, Inc.*, No. CIV.A.98-5518, 1999 WL 783712 (E.D. Pa. Sept. 22, 1999). The court held that the plaintiffs had not stated a claim under either statute. However, the court decided that discriminatory advertising cannot violate sections 1981 and 1982 based on dicta in a Supreme Court case specifically discussing those sections, as compared to more comprehensive civil rights statutes. In addition, the facts in *Brown* were distinguishable. For example, although African Americans used menthol cigarettes in numbers disproportionate to their rate in the population, they still constituted the minority of menthol cigarette smokers.

*Contract Buyers League v. F & F Inv.*, 300 F. Supp. 210, 216 (N.D. Ill. 1969) (§ 1982). The reasons to allow reverse redlining claims under Title VI are similar—construing the statute differently would mean that Title VI, part of the Civil Rights Act "created to be an instrument for the abolition of discrimination, allows [this] injustice so long as it is visited exclusively on [one ethnic group]." *Contract Buyers League*, 300 F. Supp. at 216.

For the foregoing reasons, it is ORDERED AND ADJUDGED that:

1. Defendant's Motion to Dismiss (Doc. 15) is partially granted as described herein.
2. Plaintiff's Count I is dismissed without prejudice.
3. Plaintiff may amend her Complaint, if she wishes, within fourteen (14) days of this Order.

**DONE** and **ORDERED** in Tampa, Florida, on May 4th, 2017.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record

9